All right, we have United States v. Cannady and Mr. Romano. Good morning. May it please the Court, my name is Christopher Romano, and also together with my colleague Seema Mittal, we represent the United States. The question this case presents is whether a government cooperating witness' testimony that he typically destroyed written notations of drug transactions was so gravely undermined by the post-trial discovery by the government, and the disclosure of that document during search of his residence requires the granting of a new trial. Essentially, what's being alleged is that there was a Brady violation here, and as this Court knows, the burden is on the defendant to prove with regard to that Brady violation that the evidence, the tally sheet, if you will, was favorable to him, and secondly, that it was material, that is, that prejudice ensued. And as we know from the Supreme Court's decision in Kyles v. Whitley, the test as to what's material is whether that evidence reasonably could be taken in such a light as to undermine the confidence of the verdict in this trial after a nine-day trial before a jury. To discuss materiality somewhat differently, the defendant must show that there is a reasonable probability, not a possibility, but a reasonable probability that the result of the trial would have been different had that tally sheet been available to them to cross-examine the government's witness. And it's the government's position that the tally sheet, at best, is cumulative impeachment, and the defendant in his brief alleges that the tally sheet was essentially... How long was he cross-examined at trial? Your Honor, he was cross-examined for almost three full days, and as the record reflects, that cross-examination included the fact that he had a prior record. He had a prior record for robbery, including armed robbery, and they discussed his... It was a plea bargain to... It was a plea agreement? He was cross-examined about his plea agreement. In this case, that was disclosed pre-trial. They had that. They talked to him about, in the plea agreement, what kind of sentence he was expecting, what the maximum penalty was. He was cross-examined even about the sentencing guidelines. In fact, they were talking to him extensively about what his... The jury was aware of the benefit he was receiving? Oh, absolutely. And in addition to the plea bargain or the plea agreement, they questioned him about things such as the fact that he had made inconsistent statements. They had his FBI 302. The first statement that he gave on the day he was arrested was videotaped. They had that. They had his grand jury testimony. The defense also had 302s of proffer sessions, and they would pick at him and say, Well, in this proffer session, you said this drug quantity. Now you're saying this drug quantity. In fact, Mr. Kennedy's trial counsel actually had what I would call more indicative or typical of a talent sheet. He had Mr. Kennedy write the dates, the amounts, and who those drugs pertained to. And, of course, the talent sheet, which we have here in the Joint Appendix, which is at Joint Appendix 95, that's a series of numbers and computations. It's not the typical talent sheet that we normally see where we'd have, like, Chris Romano, one boy or... What do you think a talent sheet is? I mean, that's one I don't know what it is. Well, Your Honor, I've been doing this for 40 years, and I've seen talent sheets quite a few times. And typically what they'll have on them is a reference to the type of drug, boy being heroin, girl being cocaine, or some other term that they use. So it's a statement of accounts? Yes. Yes, sir. And it'll show not only the quantities, but it'll show the person to whom it... But it's just a sheet. A talent sheet would be where a drug dealer or supplier would be tallying what he'd done with his drugs. Maybe where he'd gotten them, who owed him what, how much had been distributed. All of that largely under code names or short names. Isn't that correct? Yes, sir. It's just a statement of accounts, really. Yes. And in this case, the questions that were put to Mr. Barrett, the witness, were, well, you didn't keep a talent sheet. Or you didn't keep a sheet, for example. One of the questions was, well, you don't keep a... How long was the trial? Nine days, Your Honor. Nine days. Three cross-examining this witness. Yes, sir. And they didn't just cross-examine him about things such as his plea agreement or the amount of drugs that he had or his criminal record. They cross-examined him even about things such as there was money, and this goes to the corroboration. Mr. Barrett testified that because of the quantities of drugs that he was selling, they couldn't pay him right up front. So he would collect money and he would mail it back to the folks on the West Coast. They actually had it sent to Louisiana. And he mailed it under the name of Michael Barrett, Jr. His name was Michael Barrett. So they cross-examined him to suggest that, well, you were trying to throw your son under the bus, Michael Barrett, Jr. They cross-examined him about marital infidelities because he was married, and they showed him documents where he had co-signed for an apartment with a girlfriend or had represented income in a job that he had. Isn't that typical now, though, not the length of time, but that cross-examination, isn't that really typical of federal criminal trials now? It certainly is if they have that information available to them, yes, sir. It is typical. And the jury heard all of that, but they also heard – Let me ask you, Beth. So you started off your argument by saying that this could have been impeachment evidence. And you're right, I guess, in the sense that because he was asked whether or not he had kept any tally sheets and said no, the defense could have then pulled out that exhibit and said, well, what about this? On the other hand, he also said that in just about all other instances, any tally sheets that he would keep, he would destroy them. So in that sense, that would have been entirely consistent with his testimony at trial, that that's what he did because you only found that one tally sheet. Is that right? That's correct. And there's no indication as to when that was done. It could have been one that he had done recently and he just didn't have a chance to destroy it. So beyond that, what else is the impeachment value of the evidence? Well, from the government standpoint, none. It's cumulative. And when you compare what happened in that case to some of the other cases, for example, Kyles. In Kyles, it was a murder conviction. Is there any indication in the record that this is a tally sheet? Well, Your Honor, let me just say this way. When Judge Bennett first took the bench, he walked out and he held up the tally sheet and he said, you mean to tell me this single piece of paper is a tally sheet? And initially he said no. Then it kind of, as we indicated in the brief, it morphed to, well, it might be a tally sheet. Until at the end, and it's reflected in the joint appendix, he said it was a tally sheet. But did any person factually say this? No, sir, they did not. It's just looking at it, somebody reached it, an officer or somebody, by way of argument or otherwise, decided that could be a tally sheet. Well, we looked at it. We saw it. And contrary to cases like Kyles or even going back to Brady where the evidence was. . . But the point is, I mean, this term tally sheet, it's a very fuzzy term. And different people could understand it to mean different things. And that seems, what you held up and what Judge Shedd held up, a very sketchy document to me. I thought a tally sheet was, I mean, I could understand how a witness could think, no, I didn't keep anything as thorough as a statement of accounts or what have you. All I had was just some rough notes. And so this tally sheet, it's just not susceptible to an absolutely finite meaning. It's not the case of were you at the store on Friday morning. That's pretty clear. I don't know. That's absolutely correct, Your Honor. But what the government did is when the government uncovered this. . . Like I said, I've been doing this for 40 years. To me, this really wasn't a tally sheet, but I recognize that it did have some impeachment value. So we disclosed it. We weren't going to hide the ball, so to speak. You should be commended for that because I think you bent over backwards in the interest of prudence and caution to disclose anything that might conceivably might have been Brady material and let the district judge decide it. But at any rate, if you have a nine-day trial, an answer to one fuzzy little question where you can have different interpretations of what it is, that can't be enough to overturn the entire proceeding. It certainly shouldn't be. And let me emphasize this point. Was this available to the defense? In a sense, yes, it was, Your Honor. We had provided, and the record will reflect and I'll cite to the Joint. . . Let me say this. Do you have an open file policy? We don't have an open file policy to the extent that they can walk over at any time and look at the file, but we do invite them to come over and look at discovery or search warrant materials. And indeed, as part of the Joint Appendix, you'll see where we provided them not only the search warrant, but we provided them the inventory. And admittedly, the inventory didn't say tally sheet, but it said handwritten documents. And what happened at trial was the defense said, we don't care about that before trial. So we don't care about that. We want to look at the gun. Mr. Barrett's wife was a correctional. . . My point is, I'm just saying that it doesn't necessarily decide the case at all because I've known districts who say we have an open file policy, and that seems to be, that definition seems to vary sometimes. But the salient point I want to get answered is, was this, whatever we call it, tally sheet or otherwise, we all know what we're talking about here, was that made, was it in a form available to anybody in the case that wanted to see it? It was. Defense counsel could have come at an evidence review and looked at it. What they asked to review was not the handwritten documents, which were referenced in the inventory. I didn't ask you all that. I just said. . . It was available, yes, Your Honor. They could have gotten it if they wanted to. They could. That's correct. By the way, I'm not. . . I didn't think you had it until the case was up on appeal. No. The FBI physically had it as part of the evidence that they had seized from Mr. Barrett. It was part of the. . . Did you know you had it? We did not. We did not. As you prepared for another trial, you came across this. . . That's correct. And then said, gosh, in an abundance of caution, I'm going to let the court know that I found that in another case, but it pertains to the case we tried, so I'm just going to take it to the court. That's exactly what occurred. That was the chronology. After the trial was over and we were preparing for a trial, actually of the source of supply out in California. So the point is this was available to you or to the defense, but neither one of you actually saw it until later. Yes, sir. Yes, sir. The other point I want to make briefly is this. The tally sheet, while it may have been impeachment from the government's perspective, cumulative, it wasn't the linchpin to this case. There were phone calls that the defendant in this case, Jermaine Kennedy, made to Mr. Barrett, one of which occurred right after Mr. Barrett had been arrested and while he's being interviewed. Mr. Kennedy calls Mr. Barrett and says, I need both, meaning I need both heroin and I need cocaine. He also. . . There were 11 calls total. There were two on August 6th, the day that Mr. Barrett was arrested. There were two calls the next day. And then there were seven calls. So, in other words, your point about that is that this wasn't a typical buy-sell transaction but was something more? To establish the conspiracy, yes. It wasn't just a buy-sell situation. For example, the call on the 6th that Mr. Kennedy placed to Mr. Barrett, he said he needed both. The next day he tells Mr. Barrett, we need to hit the road, meaning we've got to get out there and start selling this stuff. And then on August 11th, which is the day when he was arrested, when he showed up where he thought he was going to acquire the drugs, he tells Mr. Barrett, make sure it's both. And then he even says to him, I've got to run these prices down, because he felt that the customers were getting over on Mr. Barrett because Mr. Barrett wasn't charging enough. So all of that goes to show that there's a preexisting relationship between the two of them. And, indeed, in one of the calls. Both didn't mean Rice Krispies and Cheerios? Yes, sir. Both heroin and cocaine. And Mr. Barrett testified to that. He didn't say it was coffee and donuts or ice cream and whipped cream. Your point is it's a very strong case. You think, and the jury believed you, but even in that very strong case, there was an extraordinary amount of impeachment allowed of this witness. There absolutely was, Your Honor. Yes, sir. I don't want to belabor the point here. I'm happy to sit down unless the Court has other questions for me at this point. Thank you. Thank you, Your Honor. All right. Mr. Stolker, we must be pleased to hear from you, sir. Good morning. May it please the Court, I'm Richard Stolker. I was appointed by this Court to represent Jermaine Kennedy. We've been really skeptical about granting new trials, haven't we? We don't grant any new trials. We may if there's a serious constitutional error at the beginning of it that affects it maybe like ineffective assistance of counsel or something, but just in the sense of some sort of after-discovered evidence because there's always the possibility after every trial that somebody's going to learn something that they wish they'd known at trial or that they could have known at trial or whatever. But so after every trial, something may always, always come to light. But we've been really saying, no, you know, we don't want to run a perfect system, but we run a darn good one. And you had a fair trial, and that's going to be it. These Rule 33 motions or whatever it is are very, very rarely granted, aren't they? I understand that, and I know that Judge Bennett understood that as well. And the government is correct that he started off the hearing on the motion for a new trial somewhat skeptically. But after a few hours of hearing, he changed his mind. I'd like to just get sort of basic and look at what the function of this court should be as a reviewing court. Judge Bennett made, of course, Judge Bennett was not the finder of fact. There was a jury at the trial. But as to the motion for a new trial, Judge Bennett did make some findings of fact, and those findings of fact are entitled to great deference by this court unless they're clearly erroneous. He also made some conclusions of law and some mixed findings of fact and conclusion of law. And unless the district court abused his discretion, those should be accepted by the court. And the reason for that is Judge Bennett sat through every minute of this trial. He heard the witness's testimony. He understood everything about this trial. And he was in the best possible, the only possible position as a neutral. So what are the critical findings of fact that you think he made that compelled him to grant the motion for a new trial? It isn't just what I think he labeled them as findings of fact. And one is that the document in question that appears at page, well, whatever it is, of the joint appendix, page 98, was a tally sheet. He made that determination. We can look at that as well as he can. I'm sorry, Your Honor? He didn't understand that there was room for confusion. If he took several hours to understand whether it was a tally sheet or not, and it took him several hours to come to a conclusion about whether this is or isn't a tally sheet, how is the witness on the stand supposed to know exactly what it is in a split second? I'm not sure I understand Your Honor's question because the only witness – The question is, is this a tally sheet or is it not? Judge Bennett starts off the hearing by saying, this isn't a tally sheet. And then over the course of a hearing that apparently lasts several hours, he says, well, no, I guess this is a tally sheet. Now, something that takes him several hours to come to a conclusion about whether it is or isn't a tally sheet, how are we to expect that it's some terrible error for a witness on the stand not to know instantly what is meant by a tally sheet and whether those sketchy notes did or didn't amount to one? Well, I think that was part of the problem was that the copy was only partially legible, and I think that when the judge got a better-looking copy, it was clear that there's numbers on there, there's indications that somebody owes money, there's calculations. Well, I mean, but the government didn't dispute that. I mean, in turning over the evidence, they described it as notations from the witness in this case regarding drug transactions, amounts of money. You call it what you want, tally sheet, I don't care what you call it. How does that get you to a motion for a new trial in light of the way this trial proceeded, the three days of cross-examination, the substantial impeachment? You get up there, you impeach him on this because he testified earlier that he had not noted anything. You get him on that, and then what? The red herring in this case, Your Honor, is that the evidence of a conspiracy was strong. There was corroborating evidence. There were airplane trips. There were all sorts of things. What isn't strong is the connection of my client and the others to the conspiracy. All of that, all of the- And how does this tally sheet help you in that regard? Because absolutely nothing, first of all, as we know, Mr. Barrett testified he never kept a tally sheet, and so he was wrong. No, no, no, no. He said that if I did keep a tally sheet, I would destroy it. Whatever. He didn't call it a tally sheet. If I did keep any records, I would destroy them shortly thereafter or immediately. That's what he said. That's correct. But here is this concurrent document with all kinds of numbers and so forth. But the only one that was found, and then if he's asked about it, the jury could reasonably conclude, you know what? He's absolutely right. That's the only sheet of paper that was found. It's consistent with his testimony that, for the most part, he never kept any records. Well, it's sort of negative evidence, and it's a little bit like the- or a list of license tags that had been seen near the crime scene and the defendant's car was not among them. So it's sort of negative evidence. If there is a written record or the only written record, this is the only documentation, other than the words that came out of the mouth of a convicted felon, that connects Mr. Kennedy to this conspiracy. So- Well, I don't know that the government would have said that it connected anybody to anything. I think they would have probably-maybe they-I don't know. If they had looked-I guess it appears the prosecutors never saw it, but I assume the FBI agents saw it and probably didn't think it was all that important. No, I wasn't referring to the tally sheet. Okay, what were you- I was just saying that the only thing that there's-certainly there was a conspiracy. You just think that would undercut his testimony even more. Is that the point? No, I'm saying there was a conspiracy. I think the evidence of a conspiracy was overwhelming. The evidence of Mr. Kennedy's connection to the conspiracy was underwhelming because the only evidence- How would this have factored in at all? How would this sheet, the presence of it, have factored in at all, in your opinion? Because here is something with numbers and calculations- How would it? And- It would be used for what? To show that, in fact, Kennedy had no involvement with this. Otherwise, why don't any of the figures line up? Why is there any reference to Mr. Kennedy or some code name that connects Mr. Kennedy to the conspiracy? What is there? This is the only document. Judge Bennett made a point of noting that there was absolutely no documentation to connect Kennedy and his co-defendants to the conspiracy. The only connection was the word of this convicted felon who insisted he had no written records. And you would have used it for impeachment? I thought you wanted to use it for impeachment, that he wasn't telling the truth about keeping records. But you said, no, you would use it for impeachment to say, why isn't my client's name on that sheet? Yes, in part. That's right. And the district court took note of that. You have four different recorded calls in which Kennedy is requesting from Barrett drugs. And Mr. Romano says both has to refer to cocaine and heroin. But I haven't seen too many cases as strong as this where there are four recorded calls from Kennedy to Barrett. And then you say, well, the evidence linking Kennedy to the conspiracy was weak? How can it be weak in light of those four recorded calls? Judge Bennett took note of the fact that none of those calls in and of themselves is inculpatory. What makes them inculpatory is, again, the testimony of Mr. Barrett testifying under a plea agreement. How could they not be inculpatory? He's making a request for drugs. They're setting up a time and place for a meeting, a drug purchase. They both arrive at the pre-designated time and place, both Kennedy and Barrett. They have a pre-planned purchase site. They both arrive there. You know, Kennedy, when he's arrested, has all these cell phones. I mean, a lot of them. And I don't see how you can say that the evidence linking this man to the conspiracy was weak. Respectfully, Your Honor, I disagree with something that you said, which is that there were telephone calls that talked about drugs. There were telephone calls that said, I want both. And, okay, maybe it wasn't coffee and donuts or Coke and Pepsi. But your point is it would only be inculpatory if a drug dealer called and said, immediately sell me cocaine and heroin. I understand they're illegal, but I want to break the law. But how do we know it was about cocaine and heroin? How do we know it wasn't if it's about drugs? It happens. Have you ever seen a case? Have you ever defended a case where anybody called and said, among dealers, bring me that crack cocaine immediately? But, Your Honor, how do we know other than the testimony of Mr. Barrett? You never know. How do we know that it wasn't about selling marijuana? Because the drug dealers suspect themselves of being monitored and surveilled and tapped. Correct. And, as a result, they go out of their way in many instances to use code and to use earlier agreed upon code language that one thing means another. It almost gets to the point where it's a separate language sometimes. Well, that's all true, Your Honor. And let's assume for the sake of this argument that the call was about drugs.  Well, that's a jury question. No. Well, it is a jury question. Who's to say it wasn't about marijuana or codeine or some other illicit substance or untaxed cigarettes? It could be about a lot of things. But the only way that the jury was told that it was about five milligrams or grams, I don't remember, of cocaine and heroin is because of the testimony of Mr. Barrett. There's absolutely nothing else. Wasn't that all Mr. Barrett was hawking, cocaine and heroin? That's all he was talking about, yes. Mr. Barrett wasn't hawking marijuana, was he? He wasn't selling marijuana, was he? I don't know that he ever was asked about that. Well, I mean, he was asking about what Mr. Barrett had. I don't think Mr. Barrett was selling untaxed cigarettes or marijuana. At least I didn't see, you know, I didn't see anywhere in the record that he was a full-service guy. Well, he certainly wasn't asked about it. He was specialized. And I don't think he would have volunteered it. I'm sure he wouldn't have volunteered it if he were. Mr. Magistro, I don't dispute. You make a good point that it was Barrett who explained all of this to a jury. And without it, it probably would not have had any context to them. But I still don't understand how the tally sheet, on top of all the other impeaching evidence, would have made all the difference such that a new trial is warranted. Well, I go back to the fact that I think it's significant that Judge Bennett did see a connection because he sat where Your Honors are sitting and watched the evidence unfold over nine days. So I think that his finding, which is explicit and answers Your Honors' question, is entitled to significant deference. He determined that the document was potentially exculpatory because the whole connection of Mr. Kennedy to the conspiracy was this history of prior dealings. An ongoing relationship. That is belied by this tally sheet. There's nothing on there about Kennedy or a code word that means Kennedy or any quantities or numbers that line up. Remember that Mr. Kennedy showed up at the mall with no money or very little money and cell phones. And pretty much that was it. So it's only Mr. Barrett's relating or claiming that Kennedy had dealt with him previously with sales of cocaine and heroin that tells the jury that he's a part of this conspiracy, which there is a conspiracy. No question about that. When you have a piece of paper that he denies existed, but that's almost the side point. When you have a piece of paper that's the only document and it's completely silent about Kennedy or anything that lines up with numbers or amounts or anything else, that's pretty significant. When you say lines up with numbers or anything, I don't understand it. What do you mean by that? There's nothing on there that you could reasonably interpret, at least in the opinion of Judge Bennett, to five grams of cocaine or a gram of heroin. There's nothing on there that would contradict his testimony. But if the document were available at trial, surely Mr. Barrett would have been cross-examined, I think, at great length about what are all these numbers and who are all these people. How is that helpful? Because at the end of the day, potentially, Mr. Kennedy is not among them. And there's nothing else in this case. Just the fact that one or two other people are mentioned doesn't mean that Kennedy is not involved. But it doesn't have to mean that, Your Honor, because there's a lot of customers, okay? That's correct. But what the standard is that the court has to have a reasonable belief,  And that's what Judge Bennett came out of this with. And so we get to review what Judge Bennett did, correct? Yes. And we're to look at this after a nine-day trial, one-third of which is impeachment of this witness. Yes. And we're to believe that asking questions about this would undermine confidence? I see there's a five on here. There are some numbers. There's 54. There's 354. If we're going to speculate, who knows? Maybe we would have said, yeah, that right there, that's what he owed me. That's what your client owed me. We're just guessing at what that is. There's nothing on here. There's no list of names as if he's doing, and it is just sort of gibberish, quite frankly. With numbers, I acknowledge that. But we go back to the point of where's anything that we can say on this sheet, which Judge Wilkinson is absolutely correct, we can look at that too. It doesn't take hours to look at this sheet. And we're trying to put this context of what could be asked about this sheet that could possibly make a difference to the jury after three days of basically getting evidence, which I take it were you trial counsel? No, I was not. Okay. The trial counsel made this witness look like a liar. I think we have to start with the proposition that although there was evidence of a conspiracy to sell her heroin and cocaine, the evidence to connect my client with that conspiracy was paper thin, as Judge Bennett recognized. And I think we understand your point. We're kind of going over the same thing, but you certainly made your point. Thank you, Your Honor. And I thank you, the Court, for appointing me to the case. Do you have anything further? I just want to make a couple of points in response. First off, when Mr. Barrett was arrested, he was caught with 25 kilos of cocaine and 6 kilos of heroin. He wasn't caught with any kind of marijuana or crack cocaine. He had taken delivery in an RV, kind of like the movie Where the Millers,  In this case, the RV had 6 kilos of heroin and 25 kilos of cocaine, which is consistent with Mr. Kennedy's reference to needing both. Just a couple of other points. With all due respect to my colleague, there's nothing in the record that Judge Bennett said that these calls weren't inculpatory. He recognized that they were. And, indeed, Your Honors have those calls. And just I'm going to be very blunt and cite one or two of those calls in the joint appendix. For example, at Joint Appendix 489, Mr. Kennedy says, I've got to run these prices down to you, which is a reference, again, to what they're charging. And then in that same conversation, he says, and this is a quote, This shit unbelievable. Ain't going to let these niggers get over on you. I've been in the field. And Mr. Barrett then says, A1, meaning the quality of the drugs. That's what he explained. And what was Mr. Kennedy's response? I already know. Now, if they didn't have a preexisting relationship and Mr. Barrett throws out the name A1 or the phrase A1, we don't have Mr. Kennedy saying, you know, what the hell are you talking about? He says, I already know. The final point is that it wasn't just the testimony and the fact that there are no names on there that identify Mr. Kennedy. There were other individuals whose names are not on there who showed up, who showed up. Some showed up with money in the hundreds of thousands or the 200,000s. Again, their names aren't on that tally sheet, but they showed up to get drugs. The jury heard all of those calls, which are consistent and corroborative. Can I ask one question? Why do you think Judge Bennett was so bothered by this? You know, Judge, I wish I had an answer for that. Like I said, he walked in. You don't, but you don't. I don't. But this court, as it's correctly identified, does a de novo review of Judge Bennett's decision, and most respectfully, the burden is on the defendant to prove that that tally sheet, if it is a tally sheet, is favorable and that it was material. We met our burden, which was disclosure. They have not met their burden to show that it was favorable and that it was material. For those reasons, I would ask this court to reverse Judge Bennett's order, granting a new trial, and reinstate the conviction and the sentence in this case. Thank you, Your Honors. Thank you. We'll come down and read counsel and move into our next case. Oh, Mr. Stoker, I see that you're court appointed, and I want to thank you on behalf of the court, because I think you did a really fine job with the case in presenting your client's point of view. Thank you.
judges: J. Harvie Wilkinson III, Dennis W. Shedd, Albert Diaz